# EXHIBIT B

ACTIVE 26530194v1 08/04/2014

**ASSET PURCHASE AGREEMENT**

by and between

**HEARTLAND CABINETRY AND FURNITURE, INC.,**
**A Debtor in Possession under Chapter 11 (subchapter 5)**

and

**HCFI Acquisition, LLC**
A Texas limited liability company

January 25, 2024

154253337.1

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is entered into as of the 25th day of January, 2024, by and between HCFI Acquisition, LLC, a Texas limited liability company, or its assigns, on the one hand ("Buyer"), and Heartland Cabinetry and Furniture, Inc., Debtor in Possession and its successors and assigns, on the other hand ("Seller").

## RECITALS

WHEREAS, Seller is engaged in the business of manufacturing, selling, and/or installing cabinets, fixtures, millwork, surfaces, architectural interiors, glass showcase frames and hardware (the "Business"); and

WHEREAS, Seller is a debtor in possession under a Chapter 11 Bankruptcy cases pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"), Heartland Cabinetry and Furniture, Inc., Chapter 11, (subchapter 5) Case No. 23-43797-elm (the "Bankruptcy Case");

WHEREAS, Seller desires to sell the Purchased Assets (defined below) to Buyer, and Buyer desires to purchase the Purchased Assets from Seller, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the recitals and of the mutual covenants, conditions and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1. DEFINITIONS OF CERTAIN TERMS; BANKRUPTCY COURT PROCESS.

1.1     Definition. In addition to terms defined elsewhere in this Agreement, the following terms shall have the meanings assigned to them herein, unless the context otherwise indicates, both for purposes of this Agreement and all Exhibits and Schedules hereto:

"Agreement" shall mean this Asset Purchase Agreement, as amended from time to time by the parties hereto.

"Assumed Contracts" shall mean only those Leases and agreements listed on Schedule 1.1, and such term does not include any of the Retained Liabilities (as defined in Section 2.4).

"Assumed liabilities" shall mean only those liabilities of Seller that Buyer assumes as part of the Purchase Price.

"Bank Debt" this shall mean any and all debts, liabilities and/or obligations of Seller to a Bank ("Bank") of any kind or nature and however arising, including Pre and Post-Petition debts or obligations of Seller to Bank.

154253337.1

"Bankruptcy Court Order" means an order of the Bankruptcy Court approving this Agreement and authorizing, pursuant to Sections 363 and 365 of the Bankruptcy Code and other applicable Sections of the Bankruptcy Code, all of the transactions and agreements contemplated hereby. For purposes hereof, an order of the Bankruptcy Court becomes "Final" if such order is not stayed, vacated or otherwise rendered ineffective when all applicable periods for appeal of such order shall have passed.

"Bankruptcy Rules" has the meaning given such term in Section 1.2.1.

"Bid Procedures Motion" has the meaning given such term in Section 1.2.3.

"Closing" shall mean the conveyance by Seller to Buyer of the Purchased Assets, and the transfer by Buyer to Seller of the consideration set forth in Section 2.3.

"Closing Date" shall mean the time and date of the Closing as specified in Section 3.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time or similar provisions of legislation replacing such law from time to time.

"Disclosure Schedule" shall mean the disclosure schedule of even date herewith attached hereto as Exhibit "A".

"Environmental, Health, and Safety Liabilities" shall mean any cost, damage, expense, liability, obligation, or other responsibility arising from or under any Environmental Law or Occupational Safety and Health Law.

"Excluded Assets" shall have the meaning given such term in Section 2.2.

"Leases" shall mean all personal property, real property, and estates and easements, including, without limitation, surface leases, right-of-way easements or leases, and equipment leases, in force and effect as of the Closing Date and related to the Business as more particularly described on Schedule 4.4.1.

"Lien" shall have the meaning given such term in Section 9.9.

"Occupational Safety and Health Law" shall mean any legal requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, and any required governmental programs designed to provide safe and healthy working conditions.

"Order" shall mean any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other governmental entity or by any arbitrator.

154253337.1

"Permitted Liens" shall have the meaning given that term in Section 9.9 and shall include any and all liens securing the Bank Debt to the extent that Buyer assumes the Bank Debt.

"Person" shall mean a corporation, an association, a partnership, a limited liability company, a trust, an organization, an individual, a government or political subdivision thereof or a government agency or any other entity.

"Purchase Price" shall have the meaning given such term in Section 2.3.

"Purchased Assets" shall have the meaning given such term in Section 2.1.

"Retained Liabilities" shall have the meaning given such term in Section 2.4.

"Sale Hearing" shall have the meaning given such term in Section 1.2.6.

"Sale Order" shall have the meaning given such term in Section 1.2.5.

"Termination Fee" shall have the meaning given such term in Section 1.2.6.

"Third Party Bidder" shall have the meaning given such term in Section 6.4.

1.2     Bankruptcy Court Process.

    1.2.1     <u>Bankruptcy Approvals</u>. This Agreement is entered into by all parties with the express understanding that this Agreement and the effectiveness of this Agreement is subject to: (i) approval of the Bankruptcy Court, and (ii) the applicable provisions of the Bankruptcy Code and the Federal Rules of the Bankruptcy Procedure (the "Bankruptcy Rules").

    1.2.2     <u>Omitted</u>.

    1.2.3     <u>The Bid Procedures Motion</u>. Seller shall file with the Bankruptcy Court a motion seeking approval of certain bidding procedures including, without limitation, payment of the Termination Fee and any applicable broker fees (the "Bid Procedures Motion").

    1.2.4     <u>The Sale Motion</u>. Not later than_____, Seller shall file with the Bankruptcy Court a motion pursuant to Sections 363 and 365 of the Bankruptcy Code (the "Sale Motion"), with supporting papers (including a copy of this Agreement), seeking approval of: (i) the sale of the Purchased Assets to Buyer pursuant to the terms of this Agreement, free and clear of any and all Liens, except Permitted Liens, pursuant to Section 363 of the Bankruptcy Code, and (ii) the assumption by Seller of the Assumed Contracts and the assignment to and assumption by Buyer of all the Assumed Contracts pursuant to Section 365(f) of the Bankruptcy Code. The Sale Motion shall be in a form reasonably satisfactory to Buyer.

1.2.5 <u>The Sale Order</u>. The "Sale Order" means an Order of the Bankruptcy Court that (i) grants the Sale Motion, (ii) is in form and substance reasonably satisfactory to Buyer and Buyer's counsel, (iii) approves the sale of the Purchased Assets to Buyer pursuant to the terms of this Agreement and the provisions of the Bankruptcy Code, (iv) approves and directs payment of sales or use tax by Seller in accordance with <u>Section 2.3.3</u>, and (v) approves Seller's assumption of the Assumed Contracts and assignment to Buyer and Buyer's assumption from Seller of all of the Assumed Contracts pursuant to Section 365(f) of the Bankruptcy Code. The Sale Order shall provide, *inter alia*, that the transfer of the Purchased Assets by Seller to Buyer shall (i) be free and clear of all Liens, except Permitted Liens; (ii) constitute a legal, valid and effective transfer of the Purchased Assets which shall be binding upon any subsequent Chapter 7 or Chapter 11 trustee that may be appointed in Seller's bankruptcy cases or the reorganized Seller or the appropriate representative of the reorganized Seller; (iii) constitute a transaction undertaken in good faith pursuant to Section 363(m) of the Bankruptcy Code on behalf of Buyer and Seller; and (iv) not subject Buyer to any liability by reason of the purchase under any state, territorial or federal law, including liability for any matter relating to the Purchased Assets as a successor or transferee, except as provided in this Agreement. The Sale Order shall also contain provisions (i) directing any clerk in any location where the Purchased Assets are located to cancel and remove from the public record any Lien (except Permitted Liens), claims, interest, encumbrance, demand, suit, action and other judicial or administrative proceeding or investigation, and (ii) finding that all existing defaults in the Assumed Contacts to be assigned to Buyer have been or will be, to the extent the same are required to be cured pursuant to Section 365 of the Bankruptcy Code, cured solely by Seller with proceeds of the sale.

1.2.6 <u>Termination Fee</u>. Seller shall pay to Buyer a fee in cash equal to $50,000.00 (the "Termination Fee") if, and only if (i) Buyer has not withdrawn, or attempted to withdraw from the transaction contemplated in this Agreement other than for the Seller's failure to meet the conditions set forth in <u>Section 9</u>, through written notice delivered to Seller on or before the date of the hearing on the Sale Motion (the "Sale Hearing"), and (ii) this Agreement is not approved by the Bankruptcy Court at the Sale Hearing and an offer is received by Seller from some other Person or entity to purchase all or a substantial portion of the Purchased Assets, which third-party offer is approved by the Bankruptcy Court and such offer results in an actual sale of the Purchased Assets to one other than Buyer.

1.2.7 <u>Termination Fee Payment/Vesting</u>. The Termination Fee shall be an administrative expense payable other than those paid in the ordinary course of business. The Termination Fee shall vest in favor of Buyer as provided above, but shall be paid on the closing date of a sale of all or a substantial

portion of the Purchased Assets to a buyer other than Buyer. Notwithstanding anything to the contrary contained in this Agreement, Buyer shall not be entitled to a Termination Fee if Buyer or any Affiliate of Buyer acquires the Purchased Assets.

1.2.8    <u>Cooperation</u>. Seller and Buyer shall use all reasonable efforts consistent with their obligations under the Bankruptcy Code and Bankruptcy Rules to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under the Bankruptcy Code, Bankruptcy Rules and other applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement, including making reasonable efforts to obtain approval of this Agreement by the Bankruptcy Court.

1.2.9    <u>Consent to Jurisdiction</u>. The Bankruptcy Court shall have exclusive jurisdiction to resolve any dispute with respect to this Agreement. The parties to this Agreement hereby consent to the jurisdiction of the Bankruptcy Court and to the entry of the final orders or judgment by the judge presiding over the Seller's Bankruptcy Cases in any dispute with respect to this Agreement.

<u>SECTION 2.</u> <u>PURCHASE AND SALE OF ASSETS ONLY</u>.

2.1 <u>Purchased Assets</u>. This Agreement evidences the purchase of the assets and ongoing Business of Seller. Subject to the terms and conditions hereof and based upon the representations and warranties made herein, at the Closing, Seller shall deliver to Buyer the applicable bills of sale (the "Bills of Sale"), in the form attached hereto as Exhibit "B", and assignment and assumption agreements, in the form attached hereto as Exhibit "C" (the "Assignment Agreements"), together with such endorsements, assignments, and other good and sufficient instruments of conveyance or transfer properly executed and acknowledged where appropriate, as shall validly and effectively sell, assign, transfer, grant, bargain, deliver, and convey to Buyer, free and clear of all Liens as of the Closing Date, their entire right, good and marketable title, and interest in, to, and under, but not including the Excluded Assets, the following (collectively, the "Purchased Assets"):

2.1.1    the Assumed Contracts; and

2.1.2    the Property and all properties, assets, privileges, rights, and interests, real and personal, tangible and intangible, owned by Seller and related to the Business, of every type and description, tangible and intangible, wherever located and whether or not reflected on the books and records of Seller including, but not limited to, the following: equipment, computers, vehicles, and furniture; all real property; all customer lists of the Business, all prepaid expenses and other items arising from payments made by Seller relating to the Business prior to the Closing Date for goods and services that have not been received by Seller as of the Closing Date; all prepaid deposits made

by Seller prior to the Closing Date under any Assumed Contracts; all as more particularly listed or described on <u>Schedule 2.1</u> hereto.

    2.2    <u>Excluded Assets</u>. Anything in <u>Section 2.1</u> to the contrary notwithstanding, there shall be excluded from the assets, properties and rights to be transferred to Buyer hereunder the following assets of Seller (the "Excluded Assets"):

    2.2.1    the minute books and stock record books of Seller;

    2.2.2    Omitted;

    2.2.3    assets of Seller not related to the Business nor listed in <u>Schedule 2.1</u>;

    2.2.4    Omitted;

    2.2.5    Omitted; and

    2.2.6    the miscellaneous assets set forth in <u>Schedule 2.2.6</u>.

    2.3    <u>Purchase Price</u>.

    2.3.1    The aggregate consideration for the purchase of the Purchased Assets shall be $2,100,000.00 minus any purchase price adjustments and/or setoffs (the "Purchase Price"). The balance of the Purchase Price, subject to the terms of this Agreement, will be delivered by delivery of new notes and loan documents or by an assumption agreement of the Bank Debt in a form and substance acceptable to Buyer and Bank, to be allocated in accordance with <u>Section 2.6</u> for Closing on all of the Purchased Assets and held by Seller subject to further Order of the Bankruptcy Court.

    2.3.2    Buyer will provide Seller with a notice of any purchase price adjustments before the Closing Date and reductions and/or setoffs to the Assumed Liabilities from the Closing Date. Any dispute relating to any purchase price adjustment or reduction or setoff, shall be resolved in accordance with the agreement of the Parties and Bank.

    2.3.3    The parties hereto agree that the Purchase Price includes any and all sales, use, transfer, or other similar tax imposed as a result of the consummation of the transactions contemplated by this Agreement.  .

    2.3.4    The Assumed Liabilities shall be utilized to satisfy claims, to the extent not previously included in the Purchase Price, of Buyer arising under this Agreement including, without limitation, the purchase price adjustments and damages.

2.4    <u>Liabilities Not Assumed by Buyer</u>. Anything in this Agreement to the contrary notwithstanding, Seller shall be responsible for all of their ongoing businesses and their respective liabilities and obligations not hereby expressly assumed by Buyer (the "Retained Liabilities"), and Buyer shall not assume, or in any way be liable or responsible for, any of such Retained Liabilities. Without limiting the generality of the foregoing, the Retained Liabilities shall include the following:

2.4.1    any liability or obligation of Seller arising out of or in connection with the negotiation and preparation of this Agreement and the consummation and performance of the transactions contemplated hereby, whether or not such transactions are consummated, including but not limited to any broker or finder fees or any tax liability so arising;

2.4.2    any liability or obligation of Seller that is specifically retained by Seller pursuant to <u>Section 7</u> or any other provision of this Agreement;

2.4.3    except with respect to those taxes which by the terms of this Agreement have been prorated and accrued as of the Closing Date and are not yet due and owing, any liability or obligation of Seller or any of their stockholders, officers, partners, or members, for any foreign, federal, state, county, or local taxes of any kind or nature, or any taxes levied by any other legitimate taxing authority, or any interest or penalties thereon, including without limitation any sales or use tax obligations applicable to the transfer of the Purchased Assets or the Assumed Contracts as contemplated by this Agreement;

2.4.4    any liability to which any of the parties may become subject as a result of the fact that the transactions contemplated by this Agreement are being effected without compliance with the provisions of the bulk sales provisions, if any, of the Uniform Commercial Code as in effect in any state or any similar statute as enacted in any jurisdiction;

2.4.5    any Environmental, Health and Safety Liabilities;

2.4.6    any liability with respect to any taxes due and owing, claims, suits, actions, or causes of action arising out of the ownership or operation of the Business on or prior to the Closing Date;

2.4.7    all responsibilities, liabilities and obligations of the Seller's respective businesses including, without limitation, any third party guarantees; and

2.4.8    any liability or obligation of Seller or any of its stockholders, officers, partners, members, or employees, for any federal tax withholdings (trust fund withholdings), or any interest or penalties thereon;

2.5    <u>Taxes and Prorations of Expenses</u>.

2.5.1   Seller warrants that the Purchased Assets including the Assumed Contracts are not, and on the Closing Date will not be, subject to or liable for any special assessments or similar types of impositions. All ad valorem taxes against or with respect to the Purchased Assets including the Assumed Contracts for the taxable period that includes the Closing Date, and demand charges and prepaid expenses shall be prorated between Buyer and Seller as of the Closing Date. In the event the amount of such taxes or assessments cannot be ascertained as of the Closing Date, proration shall be made on the basis of the preceding year and to the extent that such proration may be inaccurate Seller and Buyer agree to make such adjustments as are necessary to allocate such taxes properly between Seller and Buyer as of the Closing Date including, without limitation, the prorations set forth in Schedule 2.5.

2.5.2   Seller and Buyer agree that amounts payable under the Assumed Contracts, utility charges, and other items of expense and income attributable to the conduct of the Business shall be prorated as of the Closing Date, including, without limitation, the prorations set forth in Schedule 2.5.

2.6   Allocation of Purchase Price. The parties agree to allocate the Purchase Price to the Purchased Assets in the manner provided in Schedule 2.6.

2.7   Possession of the Purchased Assets. Simultaneously with the consummation of the transfer of the Purchased Assets, Seller, through their officers, agents and employees, shall put Buyer into full possession and enjoyment of all the Purchased Assets.

2.8   Omitted.

2.9   Further Assurances by Seller. Seller, at any time or times on and after the Closing Date, shall, without further consideration and at their sole expense, execute, acknowledge, and deliver any further bills of sale, assignments, conveyances and other assurances, documents, and instruments of transfer reasonably requested by Buyer, and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by Buyer, for the purpose of assigning, transferring, granting, conveying, and confirming to Buyer, or reducing to the possession of Buyer (subject to any existing and outstanding lease or rental agreements that are current and transferable), any or all of the Purchased Assets and for effectuating the transfer of operational control of the Business. Seller shall, after the Closing Date, also furnish Buyer with such information and documents in Seller's possession or under Seller's control or which Seller can execute or cause to be executed as shall enable Buyer to prosecute any and all pending claims, applications and the like which may be assigned hereunder.

SECTION 3. CLOSING.

The Closing shall take place in the offices of MapleMark Bank in Dallas, Texas, at 10:00 a.m. on _____, or such later date as when Buyer has received all regulatory

approvals deemed necessary or appropriate by Buyer to consummate the transactions contemplated herein and Seller has obtained Bankruptcy Court approval.

SECTION 4. REPRESENTATIONS AND WARRANTIES OF SELLER.

Except as otherwise set forth in the correspondingly numbered Schedule of the Disclosure Schedule delivered to and approved by Buyer, Seller hereby represents and warrants to Buyer and agree as follows:

4.1    Organization and Qualification. Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of Texas. Seller has the corporate power and authority to enter into this Agreement and all other agreements to be executed and delivered by Seller hereunder, to perform their obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby and have been duly authorized by the stockholders and boards of directors of Seller. This Agreement and all other agreements contemplated hereby constitute legal, valid, and binding obligations of Seller enforceable in accordance with their respective terms against Seller, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws from time to time in effect that affect creditors' rights generally and by legal and equitable limitations on the availability of specific remedies. The execution, delivery and performance of this Agreement will not (i) conflict with or violate the Certificate of Incorporation or Bylaws of Seller or (ii) violate any law, statute, ordinance, regulation, judgment, writ, injunction, rule, decree, order or any other restriction of any kind or character applicable to Seller or any of the Purchased Assets.

4.2    Approvals, Licenses, and Authorizations.

4.2.1    All licenses, permits, concessions, warrants, franchises, and other governmental authorizations and approvals of all federal, state, commonwealth, local, or foreign governmental or regulatory bodies, including, without limitation, all agencies required or necessary for Seller to operate the Business and in the manner presently operated have been duly obtained and are in full force and effect.

4.3    Environmental Matters. Except as set forth in Schedule 4.3 hereto:

4.3.1    Seller and the Purchased Assets have, and at all times have been, in full compliance with, and have not been and are not in violation of or liable under, any Environmental Law or Occupational Safety and Health Law.

4.3.2    There are no pending or, to the knowledge of Seller, threatened claims, Liens, or other restrictions of any nature, resulting from any Environmental, Health, and Safety Liabilities or arising under or pursuant to any Environmental Law or Occupational Safety and Health Law, with respect to or affecting the Business or any of the other Purchased Assets.

154253337.1

4.3.3    Seller, or any other Person for whose conduct they are or may be held responsible, does not have any Environmental, Health, and Safety Liabilities with respect to the Business or the other Purchased Assets.

4.4    Title to and Condition of Purchased Assets.

4.4.1    Schedule 4.4.1. includes a true, complete, and accurate list and a substantially complete description of all Leases relating to the Business and the other Purchased Assets. True, correct, and complete copies of all Leases previously have been delivered to Buyer. Seller shall have, as of the Closing Date, good and marketable title to the Purchased Assets, including, without limitation, the Business, and all the leasehold and easement estates created by the Leases or otherwise acquired by Seller and relating to the Business, free and clear of all Liens, except only for those obligations contained in the Leases and the Permitted Liens, including liens on all assets of Seller to the extent that Buyer assumes the Bank Debt.

4.4.2    Schedule 2.1 includes a true, complete, and accurate list of all personal property owned and used by Seller in connection with the Business. Seller shall have, as of the Closing Date, good and marketable title to all of their respective Purchased Assets, and at Closing the Purchased Assets will be free and clear of all mortgages, conditional sales agreements, Liens, or other third party interests of any nature whatsoever, except the Permitted Liens. As of the Closing Date, all of the properties and other assets that are used or necessary in connection with the Business (i) shall be owned by Seller and in their possession and control and (ii) constitute the Purchased Assets.

4.4.3    The operation of the Business in the ordinary course is not dependent upon the right to use the property of others, except such property as is leased or licensed to Seller pursuant to any of the Assumed Contracts.

4.4.4    The Purchased Assets, as of Closing Date, shall be in good operating order, condition and repair (normal wear and tear excluded) and of an appropriate character suitable for the uses for which intended in the operation of the Business in the ordinary course. The use of the Purchased Assets conforms in all material respects with all applicable laws, ordinances and regulations.

4.5    Assumed Contracts.

4.5.1    Seller has delivered to Buyer a true, correct, and complete copy of the Assumed Contracts. Each of the Assumed Contracts is valid and in full force and effect and embodies the complete understanding between the parties thereto with respect to the subject matter thereof.

4.5.2    Except as set forth in Schedule 4.5.2, there exists no breach or default, or claim of any breach or default, of any provision of any of the Assumed Contracts by any party thereto. Seller has complied with all commitments and obligations under each of the Assumed Contracts.

154253337.1

4.5.3    Except as set forth in <u>Schedule 4.5.3,</u> there are no facts or conditions that would constitute a default under the provision of any one of the Assumed Contracts.

4.5.4    Seller has not received any notice that any Person intends to cancel, modify or terminate any one of the Assumed Contracts, or to exercise or not to exercise any options thereunder.

4.5.5    Seller has not given any notice of cancellation, modification, or termination of any one of the Assumed Contracts, or of exercise or non-exercise of any options thereunder. The rights and benefits of Seller under the Assumed Contracts will not be adversely affected by the transactions contemplated by this Agreement.

4.5.6    Each of the Assumed Contracts is a valid and binding agreement enforceable in accordance with its terms (subject to the effect of bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting creditors' rights generally and of equitable principles).

4.6    <u>No Violations, Litigation or Adverse Events.</u>

4.6.1    Except as disclosed in Schedule 4.6.1, the Purchased Assets and the operations of the Business are in compliance with all applicable industry standards, and local, state and federal codes, rules, laws and Orders.

4.7    <u>Absence of Certain Events.</u> Since January 1, 2023, the Business has been consistently operated only in the ordinary and normal course and there has not been:

4.7.1    any damage, destruction, or loss, whether or not covered by insurance, materially and adversely affecting the Purchased Assets or business of Seller;

4.7.2    any sale, assignment, transfer, lease, license or other disposition or amendment, termination, release, or waiver of any of the Purchased Assets; or

4.7.3    any material change in the data required to be set forth on any Exhibit or Schedule to this Agreement.

4.8    <u>Employment Matters.</u> Except as shown on Schedule 4.8, Seller has not had at any time during the last two years, nor is there now threatened or reasonably anticipated, any employee claim including, without limitation, discrimination, workers' compensation or wage claims.

4.9    <u>Omitted</u>.

154253337.1

4.10    <u>Disclaimers</u>. The express representations and warranties of Seller contained in this Agreement are exclusive and are in lieu of all other representations and warranties, express, implied, statutory or otherwise, and Seller expressly disclaim any and all such other representations warranties. Without limitation of the foregoing, the Purchased Assets shall be conveyed pursuant hereto without any warranty or representation whether express, implied, statutory or otherwise, relating to the condition, quantity, quality, fitness for a particular purpose, conformity to the models or samples of materials or merchantability of any equipment or its fitness for any purpose, and, except as provided otherwise in the first sentence of this <u>Section 4.10</u>, without any other express, implied, statutory or other warranty or representation whatsoever.

4.11    <u>Disclosure</u>. This Agreement, the Exhibits and Schedules hereto, and all other documents and certificates delivered to Buyer and its representatives, taken as a whole, in connection with this Agreement or the transactions contemplated hereby do not contain and will not contain when delivered any untrue statement of a fact.

<u>SECTION 5. REPRESENTATIONS AND WARRANTIES OF BUYER</u>.

Buyer represents and warrants to Seller as follows:

5.1    <u>Corporate</u>. Buyer is a limited liability company duly incorporated, validly existing, and in good standing under the laws of the State of Texas. Buyer has all requisite corporate power and authority to enter into this Agreement and to perform its obligations under this Agreement. This Agreement has been duly authorized, executed, and delivered by Buyer. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Buyer will not violate any provision of, or constitute a default under, any contract or other agreement to which Buyer is a party or by which it is bound, or conflict with its Certificate of Incorporation or Bylaws.

5.2    <u>Authorization</u>.

5.2.1   This Agreement has been duly authorized by the Manager(s) of Buyer. This Agreement has been duly executed and delivered by Buyer. All other agreements contemplated hereby to be executed and delivered by Buyer will be, prior to the Closing, duly authorized, executed, and delivered by Buyer. This Agreement and all other agreements contemplated hereby constitute legal, valid, and binding obligations of Buyer enforceable in accordance with their respective terms against Buyer, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws from time to time in effect that affect creditors' rights generally and by legal and equitable limitations on the availability of specific remedies. Buyer is qualified to do business in the State of Texas.

5.2.2   neither the execution, delivery, nor performance of this Agreement or any other agreement contemplated hereby, nor the consummation of the transactions contemplated hereby or thereby, nor compliance with the

154253337.1

provisions hereof or thereof, by Buyer will, with or without the passage of time or the giving of notice, or both:

5.2.2.1 conflict with, constitute a breach, violation, or termination of any provision of, or constitute a default under, any contract or other agreement to which Buyer is party or by which it is bound;

5.2.2.2 result in an acceleration or increase of any amounts due from Buyer to any Person;

5.2.2.3 conflict with or violate the governing documents of Buyer; or

5.2.2.4 violate any law, statute, ordinance, regulation, judgment, writ, injunction, rule, decree, order or any other restriction of any kind or character applicable to Buyer or any of Buyer's properties or assets.

SECTION 6. ACCESS TO INFORMATION BY BUYER.

6.1     Prior to Closing. Until the Closing, Seller will furnish Buyer and its employees, officers, accountants, attorneys, agents, and other authorized representatives with all financial, operating, and other data, if any, related to the Business, the Purchased Assets, and Seller, shall, from time to time, as reasonably requested by Buyer and its employees, officers, accountants, attorneys, agents, and other authorized representatives grant access to Seller's properties, books, records, contracts, and documents and will be given the opportunity to ask questions of, and receive answers from, representatives of Seller and to review books, records, and properties of Seller. No investigations by Buyer or its employees, representatives, or agents shall reduce or otherwise affect the obligation or liability of Seller with respect to any representations, warranties, covenants, or agreements made herein or in any Exhibit, Schedule, or other certificate, instrument, agreement, or document executed and delivered in connection with this Agreement. Seller will cooperate with Buyer, its representatives and counsel in the preparation of any documents or other materials that may be required by any governmental or regulatory agency.

6.2     Confidentiality. All information disclosed by any party to this Agreement to another party, to the fullest extent reasonably possible, shall be kept confidential by such receiving party and shall not be used by such receiving party other than as herein contemplated or required by Order, except to the extent that such information was known by such receiving party when received or it is or hereafter becomes legally obtainable from other sources or to the extent such duty as to confidentiality is waived by the other party. In the event of termination of this Agreement, each party hereto shall use all reasonable efforts to return, upon request, to the other parties, all documents (and reproductions thereof) received from such other parties (and in the case of reproductions, all such reproductions made by the receiving party) that include information not within the exceptions contained in the first sentence of this Section 6.2.

6.3     Current Information. Seller shall advise Buyer in writing as soon as practicable, but in no event later than the day preceding the Closing Date, of: (i) the occurrence of any event that, to the knowledge of Seller, renders any of the representations or warranties of Seller set forth

154253337.1

herein inaccurate in any respect as of the date made, and (ii) the failure of Seller to perform, to its knowledge, any of its covenants or agreements set forth herein.

6.4     Continued Access by Third-Party Bidders. Anticipating that the Purchased Assets will be sold under the Sale Order, the parties agree that, for the period which commences on _____ and which expires at the close of business two (2) business days immediately preceding the Sale Hearing, potential purchasers of the Purchased Assets (a "Third-Party Bidder") shall, upon execution of a confidentiality agreement for the benefit of Seller and Buyer, be afforded comparable access rights as were afforded Buyer under the due diligence process undertaken by Buyer. While it is anticipated that no Third-Party Bidder shall have the right to assert defects other than any asserted by Buyer, any such party will be afforded: (i) an opportunity to review the due diligence materials and other papers provided Buyer in conjunction with its due diligence and investigation; and (ii) to bid on the Purchased Assets. Buyer agrees to provide access to Seller and any Third Party Bidder to its non-proprietary due diligence materials relating to the Purchased Assets. For any such Third-Party Bidder to become the successful bidder, such party must bid an amount not less than the sum of the Purchase Price, net of purchase price adjustments as defined herein, plus the Termination Fee.

SECTION 7. EMPLOYEE MATTERS.

7.1     Employees. Buyer shall have the option to offer employment to certain employees and current officers of Seller or an affiliate of Seller, upon termination by Seller, on such terms as Buyer deems appropriate; provided, however, Buyer shall have no obligation whatsoever to offer such employment.

7.2     Employment Related Claims. Seller agree that Seller, and not Buyer, shall be solely responsible for all liability, costs, and expenses (including reasonable attorneys' fees) for all existing employment claims arising from or relating to any employee or former employee of Seller during their employ by Seller including, without limitation, those relating to arbitrations, unfair labor practice charges, employment discrimination charges, wrongful termination claims, workers' compensation claims, any employment-related tort claim or any other claims or charges of or by employees of Seller, or any of the foregoing arising as a result of conditions, actions, fact or events or series of actions, facts or events which occurred prior to the Closing Date.

SECTION 8. ADDITIONAL AGREEMENTS.

8.1     Actions Pending Closing. Prior to the Closing, except as contemplated by this Agreement or as required by the Bankruptcy Court, after Seller's reasonable and practical efforts to enforce the provisions of this Section 8.1, Seller represents, warrants, and covenants that, unless the prior written consent of Buyer is or was obtained, Seller has not taken, and will not take, any direct or indirect action that would result in a violation of any of the following agreements:

8.1.1     Seller will not:

154253337.1

8.1.1.1 except as already exists and liens securing Bank Debt, create, assume or permit to exist any mortgage or other Lien upon any of the Purchased Assets whether now owned or hereafter acquired;

8.1.1.2 sell, assign, lease, or otherwise transfer or dispose of any of the Purchased Assets;

8.1.1.3 except as to any required title curative action, modify or change in any respect any Lease, Assumed Contract, or license, permit, or other authorization existing as of the Closing Date; or

8.1.2 All Purchased Assets will be used, operated, and repaired in a careful and efficient manner, and will be maintained in good working order and condition, ordinary wear and tear excepted.

8.1.3 Seller will not do any act or omit to do any act, or permit any act or omission to act, that will cause a breach of any Assumed Contracts.

8.1.4 Seller will duly comply with all applicable laws as may be required for the valid and effective performance of all acts and things contemplated by this Agreement.

8.1.5 Seller will use its best efforts to take all such action or refrain from taking any action, as the case may be, that would result in any of the representations, warranties, or covenants contained in this Agreement not being true and correct at, and as of, the Closing Date. Seller will not permit any event to occur that would result in any of the representations, warranties, or covenants contained in this Agreement not being true and correct at, and as of, the Closing Date.

8.1.6 Buyer, at its sole option and expense, may place a consultant, contractor or employee at the Business to evaluate, monitor and confirm ongoing operations from the date of execution of this Agreement through the Closing Date.

8.2    Consents. Seller shall use its best efforts and cooperate with Buyer to arrange on a timely basis for all consents required for the consummation of the transactions contemplated hereby and the normal operation of the Business and the other Purchased Assets. To the extent that any of the Assumed Contracts require the consent of a third party as a result of the transactions contemplated by this Agreement, Seller will use its best efforts to obtain such consent on or before the Closing Date.

8.3    Delivery of Corporate Documents. At or prior to the Closing, Seller shall deliver to Buyer all documents and other papers related to the operation of the Business, the other Purchased Assets, including the Assumed Contracts (whether current or past), other specific records that are in any way useful or necessary to the operation of the Business and hard copies of any books or

records, or documents and other papers, or other information and data relating to the operation of the Business or the Purchased Assets stored on any electronic media, including computers.

8.4     Cooperation After Closing.

8.4.1   Seller will cooperate with Buyer after the Closing hereunder in clearing the title to any property transferred to Buyer pursuant hereto in the event that Seller's title to any such property, as of the Closing Date, shall be defective, not marketable, or non-assignable. In this connection, Seller shall take all reasonable action, including, but not limited to, the furnishing of documents and evidences of title and assistance in the preparation and trial of any necessary litigation, to clear title to any such property, all of which shall be conducted by Seller at Seller's sole cost and expense.

8.4.2   For a period of four (4) years after the Closing Date, Buyer shall (i) preserve and retain the business records that relate to the conduct of the Business's business prior to the Closing Date and (ii) make such records available to Seller at the then current administrative headquarters of the Business upon reasonable notice and at reasonable times, it being understood that Seller shall be entitled to make and retain copies of any such records as it shall deem necessary (at Seller's expense). Buyer agrees to permit representatives of Seller to meet with its employees on a mutually convenient basis in order to enable Seller to obtain additional information and explanations of any materials provided pursuant to this Section. Seller shall reimburse Buyer for all direct expenses incurred by Buyer in connection with the foregoing. Buyer agrees not to destroy any such Business records for a period of four (4) years after the Closing Date without prior notice to Seller and without giving Seller a reasonable opportunity to take possession of such records as are designated for destruction.

8.4.3   For purposes of filing all tax returns and reports with respect to the transactions contemplated by this Agreement, the allocation of the Purchase Price shall be determined by agreement of Seller and Buyer in accordance with Section 1060 of the Code. Buyer shall prepare IRS Form 8594 and shall furnish a copy of the appropriate form to Seller. Following Seller's receipt of such IRS Form 8594, Seller shall file such form with Seller's applicable tax returns. Buyer and Seller agree to share information and cooperate to the extent necessary to permit the transactions contemplated by this Agreement to be properly, timely, and consistently reported.

SECTION 9. CONDITIONS TO BUYER'S OBLIGATION TO CONSUMMATE THE TRANSACTIONS.

Each and every obligation of Buyer to be performed at or before Closing hereunder is subject, at Buyer's election, to the satisfaction on or prior to the Closing Date of the conditions set forth below, any of which may be waived by Buyer in writing, and Seller shall use its best efforts

154253337.1

to cause such conditions to be fulfilled; provided, however, Buyer's election to proceed with the Closing of the transactions contemplated herein shall not be deemed a waiver of any breach of any representation, warranty or covenant herein, whether or not known to Buyer or existing on the Closing Date, and such action shall not prejudice Buyer's right to recover damages for any such breach.

9.1    <u>Compliance with Agreement</u>. Seller shall have performed each and all of its obligations and agreements, and complied with all covenants, warranties, and conditions, contained in this Agreement that are required to be performed or complied with by Seller on or prior to the Closing Date.

9.2    <u>Representations and Warranties</u>. The representations, covenants, agreements, and warranties of Seller contained in this Agreement shall be true, correct and complete in all material respects on and as of the Closing Date with the same force and effect as though such representations, covenants, agreements, and warranties had been made or given on and as of the Closing Date.

9.3    <u>Certificates</u>. Seller shall have delivered to Buyer Certificates signed by their duly authorized officers, dated the Closing Date, to the effect stated in <u>Sections 9.1</u> and <u>9.2</u>.

9.4    <u>Instruments of Transfer</u>. Seller shall have executed and delivered to Buyer such bills of sale, assignments (including specifically, but not limited to, the Bills of Sale and Assignment Agreements), and other instruments of transfer and conveyance (in form and substance satisfactory to counsel for Buyer) as shall be necessary to vest in Buyer all the right, title, and interest in and to the Purchased Assets, including the Assumed Contracts.

9.5    <u>Omitted</u>.

9.6    <u>No Adverse Event</u>. The Purchased Assets shall not be materially adversely affected in any way as a result of fire, explosion, earthquake, tornado, disaster, accident, threatened strike or labor disturbance, any action or threatened action by the United States or any other governmental authority, flood, draught, embargo, riot, civil disturbance, uprising, activity of armed forces, or act of God or public enemy.

9.7    <u>Proceedings Satisfactory</u>. All proceedings, corporate or otherwise, to be taken in connection with the transactions contemplated by this Agreement, and all documents, agreements and instruments incident thereto, shall be reasonably satisfactory in form and substance to Buyer's counsel.

9.8    <u>Releases and Consents</u>. Seller will have obtained all third party releases, consents, and/or waivers deemed reasonably necessary by Buyer in its reasonable judgment for the transactions contemplated by this agreement including, without limitation, transfer of the Purchased Assets.

9.9    <u>Sale Free and Clear of Liens</u>. After giving effect to the Sale Order and unless the Buyer assumes the Bank's liens on Purchased Assets, the Purchased Assets will, on the date of

154253337.1

Closing, be sold and conveyed free and clear of all Liens other than Permitted Liens. For all purposes of this Agreement, "Liens" means any liens (including, without limitation, any inchoate liens and any liens for taxes, materialmen, laborer, or mechanics' liens, judgment liens, liens imposed by operation of law, contractual liens, and liens arising out of or resulting from any employment agreements, employee benefits plans or laws, or collective bargaining agreements), encumbrances, burdens, claims, demands, judgments, orders, writs, injunctions, decrees, and arbitral awards, attachments, charges, security interests, mortgages, deeds of trust, pledges, hypothecations, adverse claims of title, preferential rights of purchase and/or first refusal rights, options, contracts for sale, transfer, or other disposition, claims of any Person, and any claims or rights of any kind, description, or nature whatsoever of or in favor of any creditors, governmental entities, or third parties, whether or not any of the above arose, accrued, or relate to any time periods before or after the filing of the Bankruptcy Cases, and whether or not a trustee is hereafter appointed in the Bankruptcy Cases for any reason. "Permitted Liens" means inchoate liens for ad valorem and personal property taxes respecting the Purchased Assets which are not yet due and payable as of the Closing Date and liens securing the Bank Debt.

9.10    Effect of Sale Order. The Bankruptcy Court shall approve the sale by entry of the Sale Order that (i) is a final non-appealable Order, (ii) is an Order in compliance with Section 363(m) of the Bankruptcy Code which allows Closing without a non-appealable final Order, and (iii) is an Order which, pursuant to Rules 6004(g) and 6006(d) of the Bankruptcy Rules, provides that (A) such Order shall not be stayed for ten (10) days after the entry thereof, but shall be effective and enforceable immediately upon entry, and (B) the provisions of such order are non-severable and mutually dependent.

SECTION 10. Omitted.

SECTION 11. Omitted.

SECTION 12. SURVIVAL OF COVENANTS, AGREEMENTS, REPRESENTATIONS, AND WARRANTIES.

All representations, warranties, covenants, and agreements contained in any certificate, instrument, or document delivered by or on behalf of any of the parties pursuant to this Agreement and the transactions contemplated hereby shall be deemed representations, warranties, covenants, and agreements by the respective parties hereunder for all purposes of this Agreement. All representations, warranties, covenants, and agreements made by the parties in this Agreement or pursuant hereto shall survive the consummation of the transactions contemplated by this Agreement, notwithstanding any investigation heretofore or hereafter made by any of them or on behalf of any of them and shall not be deemed merged into any instruments or agreements delivered at Closing. The provisions of this Agreement providing for payment of the Termination Fee will survive termination of this Agreement for any reason, to the extent the Termination Fee is payable in accordance with Section 1.2.6.

SECTION 13. EXPENSES.

Except as otherwise set forth herein, each party agrees to pay, without right of reimbursement from any other party, the costs incurred by such party incident to the preparation and execution of this Agreement and performance of their respective obligations hereunder, whether or not the transactions contemplated by this Agreement shall be consummated, including without limitation the fees and disbursements of legal counsel, accountants, and consultants employed by the respective parties in connection with the transactions contemplated by this Agreement.

SECTION 14. TERMINATION; REMEDIES.

14.1    Termination. This Agreement may be terminated at any time prior to the Closing Date:

14.1.1  by mutual agreement of Buyer and Seller;

14.1.2  if Closing does not occur on or before March 1, 2024, and the party seeking termination has not caused the failure to Close to occur, unless otherwise extended, provided, however, Buyer may, at its option, extend the termination date an additional thirty (30) days upon written notice by Buyer to Seller of such extension.

14.2    Remedies. If any condition on the obligations of Buyer or Seller under this Agreement is not met as of the Closing Date, or in the event the Closing does not occur on or before the Closing Date, and (in either case) Buyer and Seller are not in material breach of their respective obligations hereunder in the absence of the other parties being in material breach of their obligations hereunder, this Agreement may, at the option of Buyer or Seller, be terminated and the parties shall thereafter have no further obligations to one another hereunder (other than the obligations under Section 14 hereof all of which will survive such termination). Upon such termination, Buyer's damages and remedies hereunder will be otherwise limited to the Buyer Termination Fee to the extent the Termination Fee is payable in accordance with Section 1.2.6. Seller's damages and remedies will be limited to the termination of this Agreement.

SECTION 15. MISCELLANEOUS.

15.1    Notices. All notices, requests, consents, directions, and other instruments and communications required or permitted to be given under this Agreement shall be effective only if it is in writing and may be given by delivery of the same or by mailing the same registered or certified mail (postage prepaid) or express delivery (with delivery confirmed) or by sending the same by telegram, telex, telecopy, telecommunication or other similar form of communication (with receipt confirmed), in each case to the party and addressed as follows:

If to Buyer:            HCFI Acquisition, LLC
                       5 Cowboys Way
                       Suite 300
                       Frisco, TX 75034
                       (972) 670-5554

154253337.1

jhhsr@icloud.com


with a copy to:          John T. McNicholas
                         1311 Noble Heron Way
                         Naples, FL 34105
                         (239) 331-0578
                         johnmcnicholas33@gmail.com


If to Seller:


with a copy to:          Trey A. Monsour
                         Fox Rothschild LLP
                         2501 N. Harwood Street
                         Suite 1800
                         Dallas, TX 75201
                         (214) 231-5796
                         (972) 404-0516
                         tomsour@foxrothschild.com

or to such other Persons and/or addresses as shall be designated in writing pursuant to this Section 15.1 by any such party.

Any notice, direction, or other instrument will, if delivered, be deemed to have been given and received on the day it was delivered, and if mailed, be deemed to have been given and received on the third business day following the day of mailing, except in the event of disruption of the postal service, in which event notice will be deemed to be received only when actually received and, if sent by email, telegram, telex, telecopy, telecommunication, or other similar form of communication, be deemed to have been given or received on the day it was so sent.

Any party may at any time give to the others notice in writing of any change of address of the party giving such notice and from and after the giving of such notice the address or addresses therein specified will be deemed to be the address of such party for the purposes of giving notice hereunder.

15.2     Parties in Interest and Assignment.

      15.2.1   All covenants and agreements in this Agreement by or on behalf of any of the parties hereto are binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns whether so expressed or not. Except to the extent a third party is expressly given rights

154253337.1

herein, any agreement contained, express or implied, in this Agreement shall be only for the benefit of the parties hereto and their respective legal representatives, successors, and assigns, and such agreements shall not inure to the benefit of the obligees of any indebtedness of any party hereto whomsoever, it being the intention of the parties hereto that no person or entity shall be deemed a third party beneficiary of this Agreement except to the extent a third party is expressly given rights herein.

15.2.2  Except by a written agreement executed by all of the parties hereto, Seller shall not assign this Agreement or any of its rights, interests or obligations under this Agreement. Except by a written agreement executed by all of the parties hereto, Buyer may not assign this Agreement or any of its rights, interests or obligations under this Agreement other than to an entity that directly or indirectly through one or more intermediaries controls, or is controlled by, or it under common control with, Buyer. The term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by contract or otherwise.

15.3.2  Either party shall be entitled to pursue remedies for emergency judicial relief in any court of competent jurisdiction, except that immediately following the preliminary adjudication of such request for emergency relief, the parties hereby consent to a stay of the judicial proceedings pending a determination of the dispute on the merits by arbitration as herein provided.

15.3  Modification. This Agreement may not be amended, modified, altered, or supplemented except upon the execution and delivery of a written agreement signed by an authorized representative of the party against whom enforcement of the change is sought. No waiver of the performance or breach of, or default under, any condition or obligation hereof shall be deemed to be a waiver of any other performance, or breach of, or default under, the same or any other condition or obligation of this Agreement.

15.4  Entire Agreement. This Agreement embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements, representations, warranties, memoranda, communications, understandings, negotiations, and discussions, whether oral or written, between the parties relating to the subject matter hereof, other than those set forth or provided herein. All Exhibits, Schedules, and agreements and instruments called for or otherwise contemplated by this Agreement and delivered to the parties shall be considered a part hereof with the same force and effect as if the same had been specifically set forth in this Agreement.

15.5  Execution in Multiple Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by electronic transmission in portable

document format (PDF) will be as effective as delivery of a manually executed counterpart of this Agreement.

15.6    <u>Headings</u>. Each statement set forth in the Disclosure Schedule with respect to a particular section herein shall be deemed made solely with respect to such section and not with respect to any other section hereof unless specifically set forth in the Disclosure Schedule as also being made with respect to such other section. The headings of the Sections of this Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions hereof or affect in any way the meaning or interpretation of this Agreement.

15.7    <u>Governing Law</u>. This Agreement shall be governed by and construed, interpreted and enforced in accordance with the laws of the State of Texas.

15.8    <u>Gender</u>. Words of any gender used in this Agreement shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural.

15.9    <u>Invalidity, Illegality and Unenforceability</u>. Except as otherwise herein provided, in case any one or more of the Sections, Subsections, Exhibits, Schedules, or other provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect by any tribunal of competent jurisdiction or as the result of future legislative action by any competent entity possessing legislative or quasi-legislative powers, such invalidity, illegality or unenforceability shall not affect any other provision hereof and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein, and any such invalidity, illegality or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

15.10    <u>Negotiated Transaction</u>. The provisions of this Agreement were negotiated by the parties hereto and this Agreement shall be deemed to have been drafted by all the parties hereto. Notwithstanding anything herein to the contrary, neither party shall have any obligation with respect to this agreement or otherwise in connection herewith, for any special, consequential or punitive damages.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

"Buyer:"

HCFI Acquisition, LLC
a Texas limited liability company

By:_____
Name: _____
Title: _____

"Seller:"

Heartland Cabinetry and Furniture, Inc.,
Debtor in Possession

By:_____
Name: _____
Title: _____

154253337.1

"Buyer:"

HCFI Acquisition, LLC
a Texas limited liability company

By: _____
Name: _John McNicholas_____
Title: _President_____

"Seller:"

Heartland Cabinetry and Furniture, Inc.,
Debtor in Possession


By: _____
Name: _____
Title: _____

LIST OF EXHIBITS AND SCHEDULES

Exhibit "A"          Disclosure Schedule
Schedule 1.1         Assumed Contracts
Schedule 2.1         Purchased Assets
Schedule 2.2.6       Excluded Assets
Schedule 2.4         Retained Liabilities
Schedule 2.5         Tax Assessments/Prorations
Schedule 2.6         Allocation of Purchase Price
Schedule 4.3         Environmental Matters
Schedule 4.4.1       Leases
Schedule 4.5.2       Assumed Contracts in Default
Schedule 4.5.3       Assumed Contracts Default Condition
Schedule 4.6.1       Out of Compliance items.
Schedule 4.8         Worker's claims, including worker's comp. claims
Exhibit "B"          Bills of Sale
Exhibit "C"          Assignment Agreements

154253337.1